41 P.3d 377 (2002)
2002 OK 3
Edward T. BEATTIE and Walter R. Bailey, Jr., Plaintiffs/Appellants,
v.
STATE of Oklahoma, ex rel. GRAND RIVER DAM AUTHORITY, Defendant/Appellee.
No. 91,359.
Supreme Court of Oklahoma.
January 15, 2002.
K. Clark Phipps, Atkinson, Haskins, Nellis, et al, Tulsa, OK, for Plaintiffs/Appellants.
Thomas L. Vogt, Jones, Givens, Gotcher & Bogan, P.C., Tulsa, OK, for Defendant/Appellee.
*379 PER CURIAM.
¶ 1 This matter comes to the Court upon certiorari asking (1) whether certain relocation and removal rights held by the seller in connection with five utility easements were assignable so that those rights were transferred to the purchaser of the servient estate through an executed quitclaim deed, and (2) did a "subject to" clause in the quitclaim deed reserve the relocation and removal rights in the seller or otherwise prevent those rights from passing to the purchaser of the servient estate? We find that there are controverted material facts relating to whether the relocation and removal rights held by the seller were assignable so that those rights were transferred to the purchaser of the servient estate through the executed quitclaim deed. We also find, if the rights are determined to be assignable, the "subject to" clause did not reserve or otherwise prevent the relocation and removal rights from passing to the purchaser of the servient estate.

I. Factual Background
¶ 2 The essential facts are not in controversy. Plaintiffs, Edward Beattie and Walter Bailey, Jr., purchased property from the United States of America in 1996. The U.S. conveyed the property to Plaintiffs by a quitclaim deed. The property conveyed was burdened by five utility easements that the U.S. had granted to the Defendant, Grand River Dam Authority (GRDA), at various points from 1960 through 1979. Four of the easements were for a limited fifty year term and were given at no cost to GRDA. The fifth, a perpetual easement, was given for nominal consideration. Each of the five easements contained a provision which gave the U.S. the right to require relocation or removal of GRDA's facilities should the property occupied by the facilities be "needed by the United States, or in the event the existence of said facilities shall be considered detrimental to governmental activities[.]"[1]
*380 ¶ 3 The quitclaim deed from the U.S. to Plaintiffs conveyed "all of its [United States] right, title and interest in the following described property" and specifically reserved to the U.S. certain mineral interests and a flowage easement. The quitclaim deed contained a "subject to" clause that read as follows:
This deed and conveyance is expressly made subject to the following matters to the extent and only to the extent the same are valid and subsisting and affect the property:
a. Existing easements for public roads and highways, rights of way for railroads, pipelines, drainage ditches and public utilities, if any, whether or not shown of record. (Emphasis added).
In addition, the "subject to" clause specifically listed three of the five easements at issue.
¶ 4 After Plaintiffs acquired the property, they began making plans to develop the tract as a waterfront subdivision. Plaintiffs asked GRDA to relocate its facilities underground or remove them from the newly purchased property. In support of their request, Plaintiffs referenced the provision contained in each of the easements which granted the U.S. the right to demand relocation or removal should the U.S. need the property. Plaintiffs contended the relocation or removal rights were transferred or assigned to them by the U.S. through the quitclaim deed.
¶ 5 GRDA refused to either remove or relocate the facilities. As a result Plaintiffs filed this lawsuit seeking to enforce their rights under the easements. Both Plaintiffs and GRDA moved for summary judgment. The trial court granted GRDA's motion and denied Plaintiffs', resulting in this appeal. The Court of Civil Appeals affirmed the decision of the trial court, upholding the summary judgment in favor of Defendant, GRDA. This Court then granted certiorari.

II. Standard of Review
¶ 6 This Court's standard of review upon summary judgment is de novo, meaning without deference, because "the ultimate decision turns on purely legal determinations, i.e. whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions. We, like the trial court, will examine the pleadings and evidentiary materials submitted by the parties to determine if there is a genuine issue of material fact. Further, all inferences and conclusions to be drawn from the evidentiary materials must be viewed in the light most favorable to the non-moving party." Carmichael v. Beller, 1996 OK 48, 914 P.2d 1051, 1053 (citations omitted).

III. Were the Relocation and Removal Rights Assignable?
¶ 7 Plaintiffs acquired the real property burdened by GRDA's easements from the U.S. by quitclaim deed. A quitclaim deed executed in a form prescribed by statute conveys all right, title and interest of the grantor of the land. 16 O.S.1991 18; Bonebrake v. McNeill, 1971 OK 146, 491 P.2d 269. Accordingly, Plaintiffs acquired every interest of the U.S. in the real property that was not reserved in the quitclaim deed, unless that interest was not freely assignable. GRDA contends the relocation and removal rights held by the U.S. in connection with the utility easements were not assignable and therefore did not pass to Plaintiffs when they received the quitclaim deed.
¶ 8 The relocation and removal rights held by the U.S. were created in paragraph 11 of the easement grants between the U.S. and GRDA. When interests in or rights to property are created by deed, the deed should be interpreted and meaning of the parties thereto ascertained in the same manner as govern other written contracts. Jennings v. Amerada Petroleum Corp., 1937 OK 228, 179 Okla. 561, 66 P.2d 1069, 1071. In determining whether the rights under a contract are assignable the Court must look at the construction of the contract itself and "every case must turn at last upon the intention *381 of the parties." Minnetonka Oil Co. v. Cleveland Vitrified Brick Co., 1910 OK 279, 27 Okla. 180, 111 P. 326, 329.
¶ 9 Oklahoma has long held that rights under a contract are presumed to be assignable, unless the parties expressly provide otherwise.[2]Id. at 332; See also Earth Products Co. v. Oklahoma City, 1968 OK 39, 441 P.2d 399, 404. This presumption of assignability is in keeping with a long tradition to encourage economic and commercial development, "with a view that whatever one owns cannot be rendered valueless as an asset in business and trade." Minnetonka, 111 P. at 332 Another commentator has suggested that a presumption of assignability for all contracts is consistent with the fundamental policy that "free alienability . . . is essential to commerce." JOHN D. CALAMARI & JOSEPH M. PERRILLO, CONTRACTS 633, n. 138 (3d ed.1987).
¶ 10 However, Oklahoma case law has also recognized that certain rights and duties under a contract are too personal in character to permit them to be assigned. Minnetonka, 111 P. at 329; Earth Products Co., 441 P.2d at 404. These cases rest on the proposition that when the personal qualities of either party are material to the contract, an assignment would amount to a material change in the terms of the contract.[3] In Minnetonka Oil v. Cleveland Vitrified Brick Co., 27 Okla. 180, 111 P. 326 (Okla.1910), the Court examined an assigned gas supply contract. Although the gas supply contract contained no express provision prohibiting assignment, the obligor gas company sought to relieve itself of its obligation under the contract by asserting that the assignment of the contract breached its terms. Although the Minnetonka court rejected this argument, it recognized that even in the absence of an explicit provision prohibiting assignment, a contract may by its nature or terms be too personal in character to be freely assigned. The Minnetonka Court observed that in some contracts the "skill, credit, or some other personal quality or circumstances" of a party may be a material inducement to the contract.[4] In these situations, "performance by another would be an essentially different *382 thing from that contracted for."[5]Minnetonka, 111 P. at 329.
¶ 11 Relying on this exception, GRDA argues that the relocation and removal rights created in the easements are too personal in character to permit them to be assigned. Specifically, GRDA asserts that it expected the U.S., and no one else, to exercise the relocation and removal rights. GRDA argues that it would never have made substantial improvements to the property otherwise.
¶ 12 In evaluating GRDA's contention that the U.S. possessed relocation and removal rights too personal in nature to be assigned without the consent of GRDA, we are presented with a question of contract construction. Id. The easement instruments must serve as the seminal gauge of the parties' intent. Id. at 331; See also Earth Products, 441 P.2d at 404-05. In every case, this question must turn upon the intention of the parties as manifested in the agreement itself. Minnetonka, 111 P. at 329. If the intention of the parties to the deed is plain and unambiguous, that intention must be ascertained solely from the language used in the conveyance. Messner v. Moorehead, 787 P.2d 1270, 1990 OK 17. If the court determines the deed is ambiguous, extrinsic evidence may be used to determine the intent of the parties. Crockett v. McKenzie, 867 P.2d 463, 1994 OK 3.
¶ 13 In our view, the language of paragraph 11 does not unambiguously resolve the issue of whether the relocation and removal rights are too personal in character to permit them to be assigned. The instruments themselves contain no express provisions limiting or prohibiting assignment of the relocation and removal rights. Paragraph 11 does not specifically limit or restrict in any substantial fashion the manner in which the U.S., as owners of the servient estate, can exercise the rights. On the contrary, the instruments allowed the U.S. to exercise the relocation and removal rights if the land occupied by the facilities was merely "needed" or the facilities were "detrimental to governmental activities[.]"
¶ 14 On the other hand, paragraph 11 contains some language which might be construed in such a fashion to warrant the conclusion that the relocation and removal rights are so personal that they may not be freely assigned. For example, paragraph 11 conditions the exercise of the relocation and removal rights on the land occupied by the facilities being "needed by the United States" or the existence of the facilities being "detrimental to governmental activities[.]" The easements also provide that relocation or removal of facilities may only be required at the direction of the "officer having immediate jurisdiction over the property." (emphasis added).
¶ 15 We view paragraph 11 as possessing an intrinsic uncertainty, shown within the four corners of the instrument, relating to whether the relocation and removal rights are so personal that they may not be freely assigned. Accordingly, we remand to the trial court, for the trier of fact, to ascertain the provision's true meaning by considering relevant parole and extrinsic evidence that bears on the parties' intent. If the trier of fact determines that the rights are freely assignable it must decide another issue, whether Plaintiffs' needs or activities with respect to developing the purchased property actually require the relocation or removal of the GRDA's facilities.

*383 IV. The "Subject to" Clause in the Quitclaim Deed from the U.S. to Plaintiffs Did Not Reserve the Relocation and Removal Rights in the U.S. or Prevent Those Rights from Passing to the Plaintiffs if the Trial Court Upon Remand Determines The Rights Were Freely Assignable

¶ 16 The quitclaim deed executed by the U.S. stated the conveyance to Plaintiffs was "subject to" existing easements for public utilities. The Court of Civil Appeals opinion implies the "subject to" clause reserved all the referenced servient easement rights, including the relocation and removal rights in the U.S. Plaintiffs argue on certiorari that the Court of Civil Appeals incorrectly analyzed the legal impact of the "subject to" clause. Because GRDA could prevail in the event the "subject to" clause either reserved the relocation and removal rights in the U.S. or otherwise prevented those rights from passing to the Plaintiff, this Court must address the effect of the "subject to" clause.
¶ 17 The "subject to" clause in the quitclaim deed did not reserve the relocation and removal rights in the U.S. The words "subject to" are frequently used in conveyances and have historically been interpreted as meaning "subordinate to," "subservient to," "limited by," or "charged with." Hendrickson v. Freericks, 620 P.2d 205, 209 (Alaska 1980). The Hendrickson court observed that:
When used in a deed these words are generally regarded as terms of qualification, not contract. They serve to put a purchaser on notice that he is receiving less than a fee simple. There is nothing in their use which connotes a reservation or retention of property rights.

Hendrickson, 620 P.2d at 209 (emphasis added) (citations omitted); See also Hancock v. Planned Dev. Corp., 791 P.2d 183, 186 (Utah 1990) (quoting Hendrickson); Wild River Adventures, Inc. v. Board of Trustees of School Dist. No. 8, 248 Mont. 397, 812 P.2d 344, 347 (1991) ("There is nothing in the use of the words `subject to', in their ordinary use, which would even hint at the creation of affirmative rights or connote a reservation or retention of property rights.").
¶ 18 Similarly, the language of the "subject to" clause did not prevent the relocation and removal rights from passing to the Plaintiffs, if the trier of fact determines upon remand that the rights were freely assignable.[6] Holdings from this Court, reviewing language similar in effect to that of a "subject to" clause, have stated that a conveyance instrument containing terms such as "except right of way" or "less the right of way" successfully convey the grantor's entire interest in the servient estate, while recognizing the encumbrance. Jennings v. Amerada Petroleum Corp., 66 P.2d at 1071 (considering language "except right of way" and "less the right of way") and Putnam v. Oklahoma City, 1950 OK 272, 203 Okla. 570, 224 P.2d 270, 272 (considering language "except right of way"). Such words of qualification are simply not intended "to pass a less estate than the whole or entire interest of the grantor therein." Jennings, 66 P.2d at 1071.

V. Conclusion
¶ 19 We find that there are controverted material facts relating to whether the relocation and removal rights held by the seller were assignable so that those rights were transferred to the purchaser of the servient estate through the executed quitclaim deed. *384 We also find that if the rights are determined to be assignable, the "subject to" clause did not reserve or otherwise prevent the relocation and removal rights from passing to the purchaser of the servient estate. On remand the trier of fact is directed to determine whether the relocation and removal rights held by Plaintiffs in connection with the five utility easements were freely assignable. If the trier of fact determines that the rights were freely assignable, it must decide another issue, whether Plaintiffs' needs or activities with respect to developing the purchased property actually require the relocation or removal of the GRDA's facilities.
¶ 20 REHEARING GRANTED; THE OPINION OF THE COURT ISSUED MAY 15, 2001, IS WITHDRAWN AND THIS OPINION ORDERED SUBSTITUTED THEREFOR; CERTIORARI PREVIOUSLY GRANTED, COURT OF CIVIL APPEALS OPINION VACATED, JUDGMENT OF THE DISTRICT COURT REVERSED WITH INSTRUCTIONS.
¶ 21 WATT, V.C.J., HODGES, OPALA, SUMMERS, BOUDREAU, JJ.-concur.
¶ 22 HARGRAVE, C.J.-dissents.
¶ 23 KAUGER, J., with whom LAVENDER and WINCHESTER, JJ., join, dissenting.
KAUGER, J., with whom LAVENDER and WINCHESTER, JJ., join, dissenting:
¶ 1 I would withdraw the original opinion and deny certiorari as improvidently granted.
OPALA, J., concurring.
¶ 1 Although I concur in the court's judgment, I would rest today's pronouncement on the law governing covenants running with the land.[1] Because I conclude that the terms of the easement provision in question are not indefinite, I would recommit this cause to the trial court for a post-remand hearing conceptually different from that proposed by the court's plurality opinion.[2] The property-law analysis I employ provides a more solid legal foundation for reversal and remand than does the contract-law analysis relied upon by the court.[3]
¶ 2 The dispositive question tendered on certiorari is whether certain rights expressly reserved by the United States in written instruments granting five utility easements to the Grand River Dam Authority (GRDA) are exercisable by the plaintiffs, to whom the United States subsequently conveyed the land burdened by the easements.[4] The *385 rights reserved allow the United States to require GRDA to relocate or bury the utility lines it has constructed on the easements.[5]
¶ 3 Paragraph 11 of each of the five easement agreements states:[6]
That, in the event all or any portion of said land occupied by said facilities shall be needed by the United States, or in the event the existence of said facilities shall be considered detrimental to governmental activities, the grantee shall, from time to time, upon notice so to do, and as often as so notified, remove said facilities to such other location or locations on said land as may be designated by said officer, or the grantee shall reconstruct said facilities underground on said land without expense to the United States, as may be directed by said officer, and in the event said property shall not be removed or relocated within ninety (90) days after any aforesaid notice, the United States may cause the same to be done at the expense of the grantee, provided, however, that if directed to reconstruct its facilities underground the grantee may, at its option, in lieu of taking such action, wholly remove its facilities from lands of the United States as described herein, at which time, the right granted herein shall cease but the restoration obligation set forth in Condition No.13 hereof shall remain. (emphasis added)[7]
¶ 4 An easement is a nonpossessory right to the use of land in the possession of another for a definite and limited purpose.[8] An *386 easement may be created by express grant or reservation,[9] or may come about by prescription, necessity, or implication.[10] An easement by express grant, in the form of a contract, deed, or other conveyance, may, in addition to creating the easement proper, also contain various covenants relating to the underlying grant.[11]
¶ 5 A covenant is a promise that imposes a burden on the covenantor to act or refrain from acting, and confers a benefit on the covenantee consisting of the right to require the covenantor to act or not act. Covenants in deeds and other conveyances may be either real or personal. A real covenant is one which is so connected with the underlying realty that either the right to enforce the covenant's performance (the benefit) or the duty to perform the covenant's obligation (the burden), or both, passes to the heirs or grantees of one or both of the original covenanting parties by operation of law without express assignment or delegation.[12] A real covenant benefits or burdens remote parties *387 simply "because they acquire an interest in land that carries the benefit or burden along with it, . . ." provided the covenant meets certain conditions imposed by law.[13] While as many as five such conditions are sometimes recognized, this court has generally identified only three: (a) there must be privity of estate between the party claiming the benefit and the party upon whom the burden rests, (b) the burden or benefit must "touch and concern" the land, and (c) the original covenanting parties must have intended for the burden or benefit to pass to successors.[14] A covenant that lacks any one of these elements is merely personal, and is treated as an ordinary contractual provision that binds only the original covenanting parties.[15] The covenant under review in this case fulfils each of these sine qua non conditions and hence runs with the land. Each condition is discussed below.

A.

Privity of Estate
¶ 6 Although its precise origin is obscure,[16] the concept of privity of estate appears to have developed at early common law at least in part as a means of maneuvering around the rule then obtaining that contract rights were nonassignable.[17] Privity of estate avoided the nonassignability rule by substituting for privity of contract a relational basis upon which the burdens and benefits of a covenant could pass to successors.[18] Thus, to enforce a covenant by or against one who is not a party to the covenant, the party seeking enforcement must have a sufficient property-based relationship with the party against whom enforcement is sought.[19]
¶ 7 Two types of privity of estate are recognized at common law, horizontal and vertical.[20] Horizontal privity refers to the relationship between the original covenantor and covenantee. As originally conceived, horizontal privity existed only if the covenantor and covenantee created the covenant in connection with a conveyance of an estate from one to the other.[21] Vertical privity refers to the relationship between the present owner or occupier of the land and one of the original *388 covenanting parties. It exists "when the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened."[22] Many states require both types of privity to be present for a real covenant to run with the land.[23] Some authorities have made a distinction in the components of the privity requirement based upon whether the running of the benefit or the running of the burden is at issue, requiring both types of privity for the running of the burden, but only vertical privity for the running of the benefit.[24]
¶ 8 While this court has never expressly dispensed with horizontal privity as a condition for the running of a real covenant, the vertical aspect of privity is generally the only one identified in the few Oklahoma decisions involving the running of real covenants.[25] We have described the type of privity necessary for a covenant to run in Oklahoma as a "succession of relationship to the same thing, whether created by deed or other acts or by operation of law."[26] The conveyance to plaintiffs of fee simple title from the United States is a successive relationship which establishes privity of estate under Oklahoma law.

B.

Touch and Concern
¶ 9 Before a successor to the covenantee's estate may compel a covenant's performance, the covenant's benefit must touch and concern the land. This means that there must be a logical connection between the benefit to be derived from enforcement of the covenant and the property.[27] This court has found the touch-and-concern requirement fulfilled in an option to renew or to extend a lease,[28] in an *389 agreement to pay a lessor, as consideration for the execution of a lease, sums of money to be derived from the sale of oil when produced from the leased premises,[29] and in an agreement creating a right of way which limits the owners' use of a portion of realty in exchange for the opportunity for a rural landowner to have a readily available supply of natural gas.[30] In none of these cases did the court explicate the meaning of the phrase other than to suggest generally that to meet this requirement, the covenant must relate to the land.[31] The covenant under review in this case touches and concerns the land because it requires GRDA to perform a physical act upon the land which directly benefits plaintiffs in their capacity as owners of the servient estate.[32]

C.

Intent that the Covenant Run With the Land
¶ 10 Finally, a covenant runs with the land only if the original covenanting parties intended for it to run. Their intention is to be determined from their entire agreement construed as a whole and not from any single clause or provision.[33] No particular language is required to demonstrate an intent that a covenant run.[34]
¶ 11 Considering the easement agreements here under review as a whole, there is ample reason to conclude that paragraph 11 was intended for the benefit of the servient estate and not simply for the benefit of the United States. The performance of the covenant contained in paragraph 11 is valuable only to the person who owns or occupies the land to which the benefit of the covenant relates. It is of absolutely no value to the original covenantee  the United States  apart from the latter's ownership of the land. The covenant's object is to retain flexibility in the use of the servient estate in the face of unknown future developments. Hence, the value of the land is increased if the right to enforce the covenant runs with the land.
¶ 12 The conditions triggering the relocation/reconstruction rights are set out in alternative clauses. Under the first alternative, GRDA must move or bury its facilities if all or any portion of the land is needed by the *390 United States. The words United States are in no way qualified and their use in this context is nothing other than a reference to the needs of the grantor, a status now held by plaintiffs. With respect to the "detrimental to governmental activities" clause of paragraph 11, Congress long ago declared that housing is a federal concern with implications for the general welfare and security of the United States.[35] While the United States might never have directly undertaken the construction of housing on this property or have been authorized to provide funding in connection with the particular project proposed by plaintiffs, it is clear that the construction of housing in general serves a governmental purpose. It cannot be said that interference with the construction of plaintiffs' housing development is not detrimental in a broad sense to a governmental activity.
¶ 13 Defendant's burden under the easement agreements would not be substantially increased by the running of the benefit of paragraph 11 to plaintiffs, nor would it result in an expansion of the rights of the servient tenant. On the contrary, to accept defendant's argument that the covenant is personal would materially alter the balance established in the easement agreements by eliminating entirely the servient tenant's power to modify defendant's use of the property if it conflicts with the development of the land. It would lead to the absurd, one-sided result that GRDA would continue to occupy and utilize the easements, burdening the servient estate, but the servient tenant would have none of the rights reserved by the grantor for the benefit of the servient estate.[36] Such a result would constitute an unreasonable burden upon that estate. Nothing in the agreements in their entirety suggests that the original intent of the parties was to leave the covenantee's successors in such a disadvantageous position relative to that of their predecessor.[37] To hold that this covenant runs with the land simply ensures that the servient tenant possesses the same rights in the property as its predecessor had without materially altering the obligations of the easement holder.[38]
¶ 14 Having concluded that the easement terms with respect to the relocation/reconstruction rights are not indefinite and that *391 GRDA's servitude is circumscribed by these rights,[39] I would recommit this cause for a post-remand determination of whether the basic physical facts involved justify requiring GRDA to relocate or reconstruct its facilities. In a manner analogous to a judicial determination of the enforceability of a municipal zoning ordinance, I would impose upon plaintiffs the burden of demonstrating that their exercise of the relocation/reconstruction rights is reasonable in light of the pertinent basic physical facts involved.[40] This is a question of fact to be determined in light of the property's situation and of the surrounding circumstances, including such factors as those whether plaintiffs' development plans in fact necessitate the relocation or reconstruction of GRDA's facilities and whether the financial burden relocation or reconstruction would impose upon GRDA.[41]
In summary, I concur in today's reversal of summary judgment and, to the extent just stated, I also agree with the court's disposition by remand.[42]
NOTES
[1] Paragraph 11, containing the relocation and removal right, reads as follows in each of the respective easements:

That, in the event all or any portion of said land occupied by said facilities shall be needed by the United States, or in the event the existence of said facilities shall be considered detrimental to governmental activities; the grantee shall, from time to time, upon notice so to do, and as often as so notified, remove said facilities to such other location or locations on said land as may be designated by said officer, or the grantee shall reconstruct said facilities underground on said land without expense to the United States, as may be directed by said officer, and in the event said property shall not be removed or relocated within ninety (90) days after any aforesaid notice, the United States may cause the same to be done at the expense of the grantee, provided, however, that if directed to reconstruct its facilities underground the grantee may, at its option, in lieu of taking such action, wholly remove its facilities from lands of the United States as described herein, at which time the right granted herein shall cease but the restoration obligation set forth in Condition No. 13 hereof shall remain.
[2] The Restatement (Second) of Contracts also favors the free assignability of contract rights. It provides:

A contractual right can be assigned unless:
(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or
(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or
(c) assignment is validly precluded by contract.
Restatement (Second) of Contracts Ch. 15, § 317(2)(a)-(c). The law also favors the free assignability of property interests generally; it assumes that "they are alienable except in so far as their alienability is restricted by the manner or the terms of their creation." Restatement of Property Ch. 40 § 489 (comment b); See also Restatement of Property Ch. 40 § 489 (comment a).
The instant controversy involves an attempted assignment of rights and not a delegation of duties.
[3] Minnetonka Oil v. Cleveland Vitrified Brick Co., 1910 OK 279, 111 P. 326; Earth Products Co. v. Oklahoma City, 1968 OK 39, 441 P.2d 399; See also Restatement (Second) of Contracts Ch. 15, § 317(a).
[4] Various courts have employed this rational to prohibit the assignment of a contract for personal services that requires the exercise of knowledge, judgment or skill: a contract to furnish an abstract of title, See Linn County Abstract Co. v. Beechley, 124 Iowa 146, 99 N.W. 702 (1904); an agreement to render professional services as a physician, lawyer or architect, See Deaton v. Lawson, 40 Wash. 486, 82 P. 879 (1905) (re: physician); Corson v. Lewis, 77 Neb. 446, 109 N.W. 735 (1906) (re: attorney); Smith v. Bd. Of Education of Liberal, 115 Kan. 155, 222 P. 101 (1924) (re: architect). 6 AmJur 2d Assignments, § 30, pp. 169-70.

A similar rational has been used to prohibit the assignment of a contract which relies for its performance on the integrity, credit or personal responsibility of another. Examples of the application of this rule include: a contract for support and maintenance; a contract where a party is entrusted with funds or property of another; a contract where something remains to be done which an assignee cannot do. 6A C.J.S. Assignments, § 33, p. 636. "The personal confidence which precludes the assignment of rights arising out of a contract must be involved in the nature of the rights themselves." 6A C.J.S. Assignments, § 33, p. 636.
[5] After engaging in the contract construction analysis, the Minnetonka Court determined the parties did not intend to make the contract unassignable; there was no express provision in the contract to prohibit assignment and no particular element of trust, skill or confidence between the original parties to the contract which would necessitate performance by the original brick company, rather than an assignee. The Court focused its analysis upon whether a distinctive characteristic or skill was a material inducement to the contract and finding it was not, the Court permitted assignment and directed the gas company to honor the supply agreement. Minnetonka, 27 Okla. 180, 111 P. 326 (1910).

In Earth Products Co., 441 P.2d 399 (Okla. 1968) the Court analyzed the role trust, skill or confidence played in the formulation of a licensing agreement allowing the removal of sand from city property, engaging in much the same analysis as the Minnetonka Court. Similarly, the Earth Products court concluded there was no special skill or element of trust material to the formulation of the licensing agreement in question. The Court concluded the license was effectively assigned to a subsequent licensee.
[6] The Court of Civil Appeals opinion incorrectly stated, "[T]he rights of the United States under the easements were not conveyed to Plaintiffs. This result is consistent with the reservation by the United States of express mineral rights and a flowage easement." The cases cited by the Court of Civil Appeals, Cox v. Butts, 48 Okla. 147, 149 P. 1090 (1915) and Hyman v. District of Columbia, 247 F.2d 585 (D.C.Cir.1957), do not support this ultimate conclusion. Cox examined a promise or covenant made in connection with the land and questioned whether a subsequent assignee was obligated under the covenant simply by virtue of acquiring the property. The instant case focuses on rights that pass with a conveyance and does not involve an affirmative obligation or promise as Cox did. Hyman evaluated what portion of a decedent's estate can be taxed when it is "subject to" a claim of the devisee. Hyman analyzed how the "subject to" language effected the value of the inherited property, particularly for the purposes of inheritance tax. While this Court finds no fault with Hyman's analysis of the qualifying effect of the "subject to" language in a testamentary instrument, the case does not have direct application to the facts of the instant case.
[1] The term covenant running with the land is used in the newly adopted Restatement (Third) of Property (Servitudes) to encompass both real covenants and equitable servitudes. RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.4 at 30 (2000).
[2] My departure from the court's analysis extends only to that portion of the opinion which analyzes the easement instruments in contract-law terms for discussion of the assignability of the relocation/reconstruction rights, including the resulting post-remand instructions to the trial court. I am in complete agreement with the court's treatment of the "subject to" clause (contained in the deed) by which plaintiffs acquired their interest in the land in question.
[3] At the center of this case is the meaning of a provision contained in five easement agreements between the United States and GRDA. If the meaning of that provision were to be determined by contract law, the rule that "obligations to and rights of the United States under its contracts are governed exclusively by federal law" would come into play. See, Boyle v. United Technologies Corp., 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988). Basing the analysis on property-law concepts brings the case within the rule that state law, rather than federal law, governs property rights, even when the property rights of the federal government stand under consideration. Sunderland v. United States, 266 U.S. 226, 232-233, 45 S.Ct. 64, 65, 69 L.Ed. 259 (1924) ("The general rule is not to be doubted, that the tenure, transfer, control and disposition of real property are matters which rest exclusively with the state where the property lies (United States v. Fox, 94 U.S. 315, 320, 321, 24 L.Ed. 192). . . ."). Inasmuch as both parties  the plaintiffs as well as GRDA  pressed on us here the rules of state contract law, the correctness of resting today's pronouncement on that law rather than on federal contract law need not be examined.
[4] The court's resolution of this issue relies on concepts derived from the law of contracts. The court holds that the provision contained in each of the easement agreements reserving to the United States the right to require GRDA to relocate or bury its facilities is ambiguous with respect to whether the United States may assign that right to its grantee. To resolve the ambiguity, the court remands the cause to the trial court with instructions to entertain parol evidence. The court's opinion fails to mention that the summary judgment record already contains "parol evidence" on this very issue in the form of an affidavit by one of GRDA's employees. Plaintiffs submitted no evidentiary material on that issue because they (as well as GRDA) took the position below that the terms of the easements were unambiguous. The trial court granted summary judgment for GRDA. Although its decision was most likely based on lack of ambiguity in the easement instruments, the trial court's ruling did not clearly state whether it found the easement instruments to be ambiguous or not, leaving open the possibility that it considered the affidavit admissible and relied upon it in making its ruling. In my view, should summary process again be invoked on remand and GRDA's employee's affidavit tendered as evidentiary material, it would be inadmissible under Rule 13, Rules of the District Courts, 12 O.S.1991 Ch. 2, App.1, for failure to establish the affiant's personal knowledge of the subject matter of the testimony.
[5] Four of the easements provide a right of way for electric transmission lines. The fifth provides a right of way for a communications line.
[6] While the record does not include a copy of the instrument creating the communications line easement, both parties treat it as containing the same provision regarding relocation as that which appears in the four easement instruments that are included in the appellate record.
[7] The rights reserved in paragraph 11 require GRDA to "remove [its] . . . facilities to such other location or locations on said land as may be designated" or to "reconstruct said facilities underground on said land." In other words, GRDA is required under this provision to relocate or bury its power lines, not to remove them in the sense of permanently eliminating them from the property. That is the province of paragraph 12 of the easement agreements, which authorizes the United States to terminate the easements under certain circumstances.
[8] K & K Food Services, Inc. v. S & H, Inc., 2000 OK 31, ¶ 13, 3 P.3d 705, 710; Bonner v. Oklahoma Rock Corp., 1993 OK 131, ¶ 7, 863 P.2d 1176, 1181. See RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2(1) at 12 (2000) ("An easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement."). Two categories of easements are generally recognized: easements appurtenant and easements in gross. An easement appurtenant involves two tracts of land: the dominant tenement to which the benefit or advantage of the easement pertains and the servient tenement, which bears the burden or obligation of the easement. Il Giardino, LLC v. Belle Haven Land Co., 254 Conn. 502, 757 A.2d 1103, 1111 (2000); State ex rel. Comm'r of Transp. v. Dikert, 319 N.J.Super. 310, 725 A.2d 119, 122 (1999); Lazy Dog Ranch v. Telluray Ranch Corp., 965 P.2d 1229, 1234 (Colo.1998). An easement in gross involves only a single tract of land  the servient tenement  which is burdened by the right of the owner or holder of the easement to use the servient tenement for a purpose unrelated to his (or her) ownership or occupancy of a separate tract of land. R.C.R., Inc. v. Rainbow Canyon, Inc., 978 P.2d 581, 586 (Wyo.1999). GRDA's easements are in gross. An easement, whether appurtenant or in gross, does not affect title to, or possession of, the land, both of which remain in the owner of the servient tenement. See Lazy Dog Ranch supra at 1234. The rights of the servient tenant and the dominant tenant or easement holder are mutually limiting. The servient tenant retains the right to make reasonable use of the land, limited by the right of the easement holder to use the easement in a manner consistent with its intended purpose. Mason v. Garrison, 299 Mont. 142, 998 P.2d 531, 540 (2000). See also JOHN E. CRIBBET, PRINCIPLES OF THE LAW OF PROPERTY 344 (2nd ed.1975). The most common type of easement is the right of way  the right to traverse the land of another by foot or by vehicle  but easements may also be created for drainage, water, sewage, and utilities. Elliot L. Epstein and Ronald L. Bissonnette, Easements Ain't So Easy, 15 MAINE BAR JOURNAL 52, 53 (Jan.2000).
[9] No particular form of expression is required to create an easement. Any words that clearly show an intent to create it are sufficient. Cf.Tangner v. Brannin, 1963 OK 101, ¶ 5, 381 P.2d 321. Accord, Hornsilver Circle, Ltd. v. Trope, 904 P.2d 1353 (Colo.App.1995); Tanton v. Grochow, 707 N.E.2d 1010, 1013 (Ind.App.1999); Davis v. Henning, 250 Va. 271, 462 S.E.2d 106, 108 (1995).
[10] Story v. Hefner, 1975 OK 115, ¶ 13, 540 P.2d 562, 566.
[11] JON W. BRUCE AND JAMES W. ELY JR., THE LAW OF EASEMENTS AND LICENSES IN LAND, ¶ 1.07, at 1-56 (Revised ed.1995); Columbia Club, Inc. v. American Fletcher Realty Corp., 720 N.E.2d 411, 417 (Ind. App.1999).
[12] ROGER A. CUNNINGHAM ET AL., THE LAW OF PROPERTY § 8.13, at 466-469 (2nd ed.1993); Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership, 75 Haw. 370, 862 P.2d 1048, 1057 (1993); C. CLARK, REAL COVENANTS AND OTHER INTERESTS WHICH "RUN WITH THE LAND" 93 (2nd ed.1947). The law governing covenants running with the land can be traced to two distinct lines of cases, both originating in England. See 9 R. POWELL, POWELL ON REAL PROPERTY, § 60.04[1] at 60-42 (Michael Allan Wolf, ed., Matthew Bender 2000). The first line of cases began in the sixteenth century with Spencer's Case, 5 Co. 16a, 77 Eng. Rep. 72 (Q.B. 1583), in which a plaintiff unsuccessfully brought suit at law for damages for the breach of a covenant. Id. From this inauspicious beginning was born the concept of covenants running at law. Almost three hundred years later, an English court of equity in Tulk v. Moxhay, 2 Phil 774, 41 Eng. Rep. 1143 (Ch. 1848) issued an injunction to enforce in equity a covenant that would have been unenforceable at law due to the absence of privity between the original covenanting parties. See 9 R. POWELL § 60.04[1] at 60-42-43. See also Susan F. French, Toward a Modern Law of Servitudes: Reweaving the Ancient Strands, 55 S. Cal. L.Rev. 1261, 1276 (Sept. 1982). From this case evolved the rules governing the running of covenants in equity, known as equitable restrictions. Although neither Spencer's Case nor Tulk themselves formulated rules for the running of covenants, they are considered the source for the rules that gradually developed in England and the United States governing separately the running of covenants at law and in equity. See 9 R. POWELL, § 60.04[1] at 60-44. The traditional requirements for a covenant to run at law were that (1) the covenant touch and concern the land, (2) the original covenanting parties must have intended for the covenant to run, and (3) some form of privity of estate must be present. Id. at 60-43. The traditional requirements for a covenant to run in equity were that (1) the covenant must touch and concern the land, (2) the original covenanting parties must have intended for it to run, and (3) the successor to the burden must have had notice of the covenant. Id. at 60-44. When law and equity courts were separate, the available remedy for breach of a running covenant  damages or injunctive relief  depended upon whether the covenant met the requirements of a real covenant or of an equitable restriction. Id. § 60.07 at 60-116. The present-day merger of law and equity in a single body, together with judicial confusion over the myriad technical rules governing which covenants run at law and which in equity, has resulted in the consolidation of the two separate lines of cases generated by Spencer's Case and Tulk. Id. Courts today, in general, will grant the relief appropriate to the facts regardless of the real or equitable label that might be attached to the covenant in suit. Id. The recently adopted Restatement (Third) of Property (Servitudes) has gone a step further, abandoning as anachronistic the separate treatment of real covenants and equitable restrictions, as well as of easements, and adopting a unified set of rules for the transfer, construction, and termination of all such interests in land, denominated collectively "servitudes." Id. § 60.11[2] at XX-XXX-XXX. The Restatement (Third) replaces the traditional rules governing these interests "with rules designed to identify more accurately the situations in which the threatened risks of harm to the general welfare justify judicial intervention to invalidate properly created transactions intended to create interests that run with the land." RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 3.1, Comment A at 348.
[13] ROGER A. CUNNINGHAM ET AL., supra note 12, § 8.13, at 468. Noyes v. McDonnell, 1965 OK 16, ¶ 7, 398 P.2d 838, 840. See also FRENCH, supra note 12 at 1270.
[14] Noyes v. McDonnell, supra note 13 at ¶ 7, at 840. The other two factors commonly recognized are a writing that satisfies the Statute of Frauds and the existence of privity between the original covenanting parties. See ROGER A. CUNNINGHAM ET AL., supra note 12, § 8.13, at 469.
[15] Vulcan Materials Co. v. Miller, 691 So.2d 908, 914 (Miss.1997).
[16] See 9 R. POWELL, supra note 12 § 60.04[2][c] at 60-62 63 ("The origins of the privity requirement are unclear. It appears first in dicta in the 1789 English decision of Webb v. Russell [3 T.R. 393, 100 Eng. Rep. 639 (K.B.1789)], although it is frequently attributed to Spencer's Case [5 Co. 16a, 77 Eng. Rep. 72 (Q.B.1583)], decided two hundred years earlier.").
[17] Orange and Rockland Utilities, Inc. v. Philwold Estates, Inc., 52 N.Y.2d 253, 437 N.Y.S.2d 291, 418 N.E.2d 1310, 1314 (1981). See 9 R. POWELL, supra note 12 § 60.11[4] at 60-170 ("[A]t the time real covenant doctrines were being developed, assignments of contractual duties were impossible."). See also, French, supra note 12 at 1269-1270.
[18] Runyon v. Paley, 331 N.C. 293, 416 S.E.2d 177, 184 (1992).
[19] Id.
[20] James L Winokur, The Mixed Blessings of Promissory Servitudes: Toward Optimizing Economic Utility, Individual Liberty, and Personal Identity, 1989 Wis. L.Rev. 1, 92; French, supra note 12 at 1272.
[21] Flying Diamond Oil Corp. v. Newton Sheep Co., 776 P.2d 618, 628 (Utah 1989). Under the traditional horizontal privity rule, adjoining landowners could not enter into a covenant for their mutual benefit apart from a conveyance and have the covenant be enforceable by and against their successors. John W. Fisher, II, The Evolution of Restrictive Covenants in West Virginia, 100 W. Va. L.Rev. 55, 59. At English common law, only a landlord-tenant relationship between the original covenanting parties is recognized as creating horizontal privity. Id.; Winokur, supra note 20 at 97 n. 43; French, supra note 12 at 1272-1273. American courts have accepted other relationships as well, including that between grantor and grantee and between owners of easements. French, supra note 12 at 1273.
[22] See 9 R. POWELL, supra note 12 § 60.04[2][c] at 60-67. At one time, strict vertical privity required succession to an estate of equal duration to that of the original covenanting party. That requirement has gradually loosened to permit succession to something less than the identical estate. French, supra note 12 at 1273.
[23] William B. Stoebuck, "Running Covenants: An Analytical Primer," 52 Wash. L.Rev. 861, 867 (1977). See, e.g., Runyon, supra note 18 at 184.
[24] The Restatement (Second) of the Law of Property, published in 1944 and superceded only last year by the Restatement (Third) of Property (Servitudes), took the position that both types of privity were necessary for the running of the burden of a real covenant, but that vertical privity alone would suffice for the running of the benefit. This distinction has been resoundingly criticized as resting on inadequate support in the case law. See, e.g., C. CLARK, supra note 12 at 137-143 and App. 1; Henry Upson Sims, The Law of Real Covenants: Exceptions to the Restatement of the Subject by the American Law Institute, 30 CORNELL L.Q. 1 (1944). The newly adopted Restatement (Third) of Property (Servitudes) makes no such distinction. Rather, it rejects any type of privity of estate as necessary for the creation of a servitude.
[25] Most of Oklahoma's privity of estate decisions arise out of a lessor-lessee relationship between the original covenanting parties. See, e.g., Castle v. Double Time, Inc., 1986 OK 80, 737 P.2d 900. Because the landlord-tenant relationship supports horizontal privity even under the strict English common law requirement, these cases have provided no opportunity for the court to undertake a systematic discussion of the current status of the horizontal privity requirement. Oklahoma jurisprudence on the enforcement of covenants respecting realty where the original parties were not in a tenurial relationship have similarly omitted any discussion of the horizontal aspect of privity. For example, in litigation for enforcement of covenants contained in plat restrictions and in agreements creating restrictive covenants among landowners, the absence of horizontal privity has not been raised as a barrier to the covenant's performance. See, Noyes v. McDonnell, supra note 13; O'Neil v. Vose, 1944 OK 26, ¶¶ 14, 15, 145 P.2d 411, 415. The case sub judice would not necessitate a decision on whether horizontal privity has been or should be dispensed with as a prerequisite for a real covenant to run. Should horizontal privity remain a prerequisite for the running of the benefit of a covenant in Oklahoma, the requirement would be satisfied in this case because the covenant was created in connection with the larger land transaction between the United States and GRDA.
[26] Macias v. Guymon Industrial Foundation, 1979 OK 70, ¶ 5, 595 P.2d 430, 433 (privity of estate established through the relationship between successive adverse possessors).
[27] Columbia Club, Inc., supra note 11 at 420.
[28] Castle, supra note 25 at ¶ 11, at 903.
[29] Local Fed. S & L of Okla. City v. Eckroat, 1940 OK 123, ¶ 22, 100 P.2d 261, 262.
[30] Richardson v. Mustang Fuel Corp., 1989 OK 53, ¶ 19, 772 P.2d 1324, 1328.
[31] Id. More explicit conceptualizations of the touch-and-concern requirement are found in many treatises and scholarly articles. See, e.g., C. CLARK, supra note 12, at 97 ("If the promisor's legal relations in respect to the land in question are lessened  his legal interest as owner rendered less valuable by the promise  the burden of the covenant touches or concerns that land; if the promisee's legal relations in respect to that land are increased  his legal interest as owner rendered more valuable by the promise  the benefit of the covenant touches or concerns that land."). See also Paula A. Franzese, "Out of Touch:" The Diminished Viability of the Touch and Concern Requirement in the Law of Servitudes, 21 SETON HALL L.REV. 235, 238 (1991) ("[T]he `benefit' and the `burden' of the given promise [must] be analyzed separately. Accordingly, the benefit of a covenant will not run unless it touches and concerns the land, a condition typically construed to require that the covenant's performance render the promisee's interest in land more valuable. The rule is sometimes expressed as satisfied if the covenant confers `a direct benefit on the owner of land by reason of his ownership,' or if, in layperson's sensibilities, the given promise would be viewed as aiding `the promisee as landowner.' Attendantly, the burden of a covenant will not bind successors unless it too touches and concerns the land. This is generally interpreted to mean that the covenant's performance renders the promisor's interest in land less valuable." (citations omitted)).
[32] Columbia Club, Inc., supra note 11 at 420 ("The clearest example of a covenant that `touches and concerns' the land is one which calls for a party to do, or refrain from doing, a physical act on the land."). See also, ROGER A. CUNNINGHAM ET AL., supra note 12, § 8.15 at 471 ("The clearest example of a covenant that meets the requirement is one calling for the doing of a physical thing to land.").
[33] Scrivner-Stevens Co. v. Boliaris, 1963 OK 194, ¶ 13, 385 P.2d 911, 914-915; Founders Bank & Trust Co. v. Upsher, 1992 OK 35, ¶ 11, 830 P.2d 1355, 1361 ("Intent is to be gathered from the entire instrument.").
[34] No particular words are necessary to convey an estate of inheritance. See the provisions of 16 O.S.1991-29, which provide:

"Every estate in land which shall be granted, conveyed or demised by deed or will shall be deemed an estate in fee simple and of inheritance, unless limited by express words."
[35] See e.g., the Housing Act of 1949, 42 U.S.C.A. § 1441 (setting the goal of ". . . a decent home and a suitable living environment for every American family, . . .").
[36] Other important rights of the servient tenant which are either reserved by the United States to itself by name, written in terms of the United States' interest in the property, make reference to the governmental aspect of the property's ownership, or are expressly made exercisable by a government official include (a) the right set forth in paragraph 6 to require GRDA to repair or replace "any property of the United States damaged or destroyed by the grantee incident to the use and occupation of the said premises" or, at the discretion of the officer having immediate jurisdiction over the property, to require the payment of money as compensation for any such damages,(b) the right set forth in paragraph 10 to require GRDA to provide such service from its power lines "as may be required from time to time for governmental purposes on said land" at favorable rates, and (c) the right set forth in paragraph 12 giving the Secretary of the Army the power to terminate the easements "upon reasonable notice to the grantee if the Secretary of the Army shall determine that the right-of-way hereby granted interferes with the use or disposal of the said land or any part thereof by the United States, . . ." Acceptance of defendant's interpretation of paragraph 11 would, by analogy, deprive plaintiffs of the benefit of any of these provisions.
[37] GRDA points to the provisions of paragraph 12 of the easement agreements, which permit the United States to terminate the easements if their existence interferes with the use or disposal of the land. GRDA argues that paragraph 12 would be superfluous if a successor to the United States could exercise the reconstruction/relocation rights contained in paragraph 11. Contrary to GRDA's contention, the running of the paragraph 11 covenant does not render the termination provisions of paragraph 12 pointless. A potential buyer of the land, who would be entitled to compel relocation or burial of GRDA's facilities if the paragraph 11 covenant runs, might nevertheless prefer not to be bothered doing so, and might therefore condition purchase of the land on the seller terminating the easements before consummation of the conveyance.
[38] Cf. Town of Skiatook v. Brummett, 1963 OK 256, 387 P.2d 115 (the court held it was the intent of the original covenanting parties that the town's promise to supply water to a single home, given in exchange for a right of way to construct a water pipeline, would run with the land to subsequent owners of that home, but it was not the intent of the original covenanting parties that upon development of the land, the covenant would run to sixteen separate homes).
[39] The provisions of 60 O.S.1991-54 state:

"The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired."
[40] In municipal zoning ordinance cases, the basic physical facts are used to determine whether the reasonableness of the ordinance is "fairly debatable." If it is, the ordinance is upheld. Oklahoma City v. Barclay, 1960 OK 254, ¶ 16, 359 P.2d 237, 242; City of Tulsa v. Swanson, 1961 OK 286, ¶ 2, 366 P.2d 629, 631.
[41] Should the trial court determine on remand that the physical facts do not justify the exercise by plaintiffs of the relocation/reconstruction rights, plaintiffs may nevertheless find conditional support for their objective in the newly adopted Restatement (Third) of Property (Servitudes), which would permit a servient tenant to unilaterally relocate an easement as long as the relocation does not significantly lessen the utility of the easement, increase the burden on the easement holder, or frustrate the easement's purpose, and the servient tenant bears the expense of relocating the easement. RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.8 at 559 (2000).
[42] Russell v. Bd. of County Comm'rs, 1997 OK 80, ¶ 35, 952 P.2d 492, 504 ("Where on the judgment's reversal a cause is remanded, it returns to the trial court as if it had never been decided, save only for the `settled law' of the case.").