2016 OK 65

**LOGAN COUNTY CONSERVATION DISTRICT, an Oklahoma Conservation District, Petitioner/Appellee;**

v.

**PLEASANT OAKS HOMEOWNERS ASSOCIATION, Phyllis Jean Crowder and John Herman White, Jr., Respondents/Appellants,**

and

Pleasant Oaks Lake Association Inc.; Pleasant Oaks Homeowners Association; Phyllis Crowder; John Herman White, Jr.; Dale Broomfield; Susan Broomfield; Michael Bradley Broomfield; Earl B. England; Kathy K. England; Norbert K. Wenger; Michael D. Fairless; Wanda E. Fairless; Quayyum Qaisar Jalil and Tasnim Razia Begun Revocable Trust Dated October 12, 2005; Donovan R. Underwood; Marion Walton; Leon Walton; Charles C. Linhardt; Jennifer D. Linhardt; George Scott Wells; Marilyn Elkins Wells; Ed Betchan; Ericka Betchan; William Jack Skaggs; Winona L. Skaggs Revocable Trust; Erwin Dale Leaverton; Thelma J. Leaverton; William Louis Keel; Danny Cline; Thomas Eugene Plunkett; Carla R. Plunkett; Jay W. Barnett; Tasa C. Barnett, Respondents.

Case Nos. 113,313, 113,318
(companion cases)

Supreme Court of Oklahoma.

FILED JUNE 7, 2016

Stephen L. McCaleb, Derryberry & Naifeh, Oklahoma City, Oklahoma, for Appellants Phyllis Jean Crowder and John Herman White, Jr.

Lou Keel, 105 N. Hudson, Suite 300, Oklahoma City, Oklahoma, for Appellant Pleasant Oaks Lake Association, Inc.

Kelly F. Monaghan and Lori Gilliard, Holloway & Monaghan, Tulsa, Oklahoma, for Appellee Logan County Conservation District.

GURICH, J.

### Factual Background & Procedural History

¶1 Cottonwood Creek watershed is an area covering approximately 379 square miles in parts of Logan, Oklahoma, Canadian and Kingfisher Counties. The area was prone to flooding, and in March of 1962, Logan County Soil and Water Conservation District No. 9 (LCSWCD), Cottonwood Creek Water and Soil Conservancy District No. 11 (CCWSCD), and the United States Department of Agriculture (USDA), prepared a plan to alleviate dangers associated with uncontrolled water flow. Proposed structural measures under the plan included construction of fifty-eight floodwater retarding structures designed to detain water, store sediment deposits, and enhance the state's water supply.

One of the structures included in the work plan was Floodwater Retarding Structure No. 54 (FWRS 54).

¶2 On September 24, 1962, D.C. Fitzwater and Odessa Ann Fitzwater granted an easement (Fitzwater Easement) to CCWSCD and LCSWCD, which read, in part:

[F]or the purpose of:

For or in connection with the construction, operation, maintenance and inspection of the following described works of improvement to be located on the above described land; for the flowage of any waters in, over, upon or through such works of improvement; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such works of improvement:

  a. floodwater retarding structure No. 54[.]

1. In the event construction of the above described works of improvement is not commenced within 120 months from the date hereof, the rights and privileges herein granted shall at once revert to and become the property of this Grantor, his heirs and assigns.

2. This easement includes the right of ingress and egress at any time over and upon the above described land of the Grantor and any other land of the Grantor adjoining said land for the purpose of construction, the checking of operations, and the inspection and maintenance of the structure.

3. There is reserved to the Grantor, his heirs and assigns, the rights and privileges to use the above described land at any time, in any manner and for any purpose that does not interfere with construction, operation, maintenance and inspection of the structure.

  . . . .

5. The Grantee is responsible for operating and maintaining the above described works of improvement.

  . . . .

The Fitzwater Easement covered the NW ¼ of Section 36, Township 15 North, Range 3 West. Additional easements were obtained

from several landowners in the area for the purpose of water storage (Impoundment Easements). The Impoundment Easements encompassed the same tract of land and authorized the following usage: ·

[F]or the purpose of:

For the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by those certain works of improvement which are described and · are to be located as follows:

a. floodwater retarding structure No. 54[.]

Aside from geographical boundaries, neither the Fitzwater nor Impoundment deeds contained mandatory design specifications for FWRS 54.[1] Logan County Conservation District (LCCD) was created in 1971, and became the successive owner of the easements.

¶3 Construction of FWRS 54 was finalized in November of 1973. At the time of its completion, FWRS 54 was classified as a significant hazard class (b) dam, which indicates uncontrolled flooding could cause significant damage to agriculture and infrastructure.

¶4 In 1977, LCSWCD executed a deed returning part of the Fitzwater and Impoundment Easements to the current servient estate holders.[2] Several homes have since been built around what is referred to by local residents as Pleasant Oaks Lake. The impounded water created by FWRS 54 is approximately 22–acres. Local residents built a common recreational ground and concrete boat ramp.

¶5 Changes in safety criteria and the development of houses downstream compelled the USDA and Oklahoma Water Resources Board (OWRB) to recast FWRS 54 as a high hazard class (c) dam.[3] This new classification was based on changes in safety criteria, the

development of 26 houses downstream, and the potential for loss of life following a structural failure. In March of 2006, the USDA issued a written proposal calling for the rehabilitation of FWRS 54. The USDA watershed plan suggested multiple repairs and improvements to FWRS 54, including: (1) removal of the existing principal spillway tower; (2) construction of a new principal spillway tower; (3) replacement of the existing principal spillway outlet; (4) replacement of the existing principal spillway conduit; (5) installation of an impact basin at the pipe outlet; (6) construction of an outlet channel; (7) construction of a vegetated wave berm; (8) and extension of the auxiliary spillway with a slope change in the exit channel. In approximately February 2008, LCCD tendered a written application to the OWRB seeking authorization to perform rehabilitation work on FWRS 54 as recommended by the 2006 USDA work plan. OWRB approved the application on March 11, 2008.

¶6 On March 25, 2011, LCCD filed a petition with the District Court of Logan County, seeking a declaratory judgment allowing it to perform rehabilitation work on FWRS 54. The petition alleged the Fitzwater and Impoundment Easements vested LCCD with the right to complete the rehabilitation project. Property owners Phyllis Jean Crowder and John Herman White, Jr. answered and claimed that the proposed work did not fall within the scope of the original easements. Accordingly, Crowder and White maintained the rehabilitation project would lead to an improper taking of their land. Pleasant Oaks Lake Association (POLA) and individual homeowners also answered, alleging the project would constitute a taking requiring payment of compensation.

¶7 On April 11, 2012, LCCD filed a motion seeking summary judgment. The motion as-

---

1. A work plan was prepared in 1962 by several conservancy districts affected by the Cottonwood Creek watershed, together with help from the USDA. This work plan is the only document which provides design specifications pertaining to the initial assembly of FWRS 54.

2. Although not entirely clear in the record, it appears as though the portion returned to the landowners was either (a) not needed in further-

ance of constructing FWRS 54; or (b) unnecessary for impoundment of water.

3. OWRB is vested with the power to carry out the provisions of the Oklahoma Dam Safety Act (82 O.S. 2011 § 110.1, et seq.), including "rules relating to hazard and size classifications, minimum standards for design, operation and maintenance of dams." 82 O.S. 2011 § 110.5.

serted LCCD was authorized to perform work on FWRS 54 based upon the unambiguous language contained in deeds establishing the Fitzwater and Impoundment Easements. LCCD maintained that the intended purpose of the easements, and the terms "construction, operation, maintenance and inspection," authorize the district to rehabilitate FWRS 54. Consequently, LCCD claimed there could be no taking of private property entitling Respondents to compensation. LCCD's motion included a sworn affidavit from a professional engineer to demonstrate all rehabilitation efforts would take place entirely within the area described in the Fitzwater and Impoundment Easements.[4] Respondents filed a joint objection to LCCD's motion and contemporaneously requested summary judgment be issued in their favor. POLA and the homeowners argued the terms "operation and maintenance" contained in the deeds were not synonymous with the proposed rehabilitation of FWRS 54. However, the objection did not include any evidentiary material to refute LCCD's allegations of material facts. The sole attachments to the motion were a trial court order and a subsequent opinion from the Court of Civil Appeals from an unrelated case.[5] These decisions found a similar rehabilitation proposal in Sequoyah County was broader in scope than permitted by the original easement. On October 31, 2012, the trial judge denied both summary judgments.

¶ 8 POLA and individual homeowners renewed their motions for summary judgment on March 14, 2014. In their supporting brief, POLA claimed that by emptying the lake, LCCD's actions would kill fish, eliminate wildlife, and devastate the quality of life for the homeowners for an unknown length of time. POLA also alleged that rehabilitation of FWRS 54 would cause "real and valid damage" to the homeowners' property. Once more, POLA provided no scientific or other evidence to support these contentions.[6] In a separate motion, Respondents Crowder and White also sought partial summary judgment. Their motion included an affidavit alleging that nineteen of the twenty-one lots in their possession were within the boundaries of the easement and would "likely be affected by the rehabilitation." Crowder and White further argued Petitioner had no right to trespass on their land to perform reconstruction work on FWRS 54. The motion was based upon pure speculation and did not include any scientific or other evidence to refute the alleged scope of the easements or how the project would "affect" their properties.

¶ 9 LCCD filed objections to the respective motions. Therein, LCCD reasserted its contentions: (1) the properties were subject to the Fitzwater and Impoundment Easements; and (2) the proposed rehabilitation on FWRS 54 was within the scope of the original instruments. LCCD maintained the trial court, in its previous ruling, had improperly relied on extrinsic evidence to interpret the unambiguous deeds. LCCD further suggested legislation adopted in 2008 demonstrated the terms operation and maintenance include necessary repairs or rehabilitation work on flood control structures in Oklahoma.[7] Finally, LCCD

---

4. Chris Stoner is a professional Engineer with the National Resource Conservation Service, a division of the USDA.

5. The unpublished Court of Civil Appeals opinion in Case No. 106875 is distinguishable and unpersuasive. More importantly, the record in the present case lacks *any* evidentiary material which would support Respondents' position that the proposed rehabilitation of FWRS 54 exceeds the scope of the original easements.

6. Letters/affidavits from several homeowners were attached to POLA/Homeowners' motion. However, none of this evidentiary material challenged the scope of the Fitzwater or Impoundment Easements, or the authority of LCCD to exercise its rights under the easements.

7. Title 27A O.S.Supp. 2008 § 3–3–411(B) of the Conservation District Act became effective in 2008, and provides:

Pursuant to the Conservation District Act, the phrase "operation and maintenance" or "operate and maintain" as used in a variety of contractual documents, easements, statutes, rules, and other legal authority by the conservation districts and their assigns shall be interpreted to:
A. Encompass the terms repair, modification, alteration, rehabilitation, upkeep, upgrade, improvement, construction, reconstruction, decommission, and inspection; and
B. Benefit the state and conservation districts.

alleged the easements imposed no obligation to maintain the reservoir at a specific water level.

¶ 10 On July 21, 2014, the trial court held a hearing and denied Respondents' motions for summary judgment. However, after reconsidering his previous order, the trial judge sustained LCCD's motion for summary judgment. In the September 19, 2014 Journal Entry of Judgment, the trial judge concluded 27A O.S.Supp. 2008 § 3–3–411 "was intended by the legislature to be applied retroactively and such intent is necessarily implied from the language used in the statute."[8] Accordingly, the lower court ruled LCCD had the right under the Fitzwater and Impoundment Easements to perform rehabilitation work on the dam; and therefore, LCCD had no obligation to tender compensation or maintain the lake water level.

¶ 11 On October 17, 2014, Respondents Crowder and White filed a Petition in Error in Case No. 113,313. On October 20, 2014, Respondents POLA and individual homeowners filed a Petition in Error in Case No. 113,318. We issued an order making the two proceedings companion cases. LCCD filed a motion requesting the proceeding be retained, which we granted.

### *Standard of Review*

¶ 12 Whether summary judgment was properly granted is a question of law subject to *de novo* review. Benefiel v. Boulton, 2015 OK 32, ¶ 10, 350 P.3d 138, 142. We must determine whether the "trial court erred in its application of the law and whether there is any genuine issue of material fact." Kluver v. Weatherford Hosp. Auth., 1993 OK 85, ¶ 14, 859 P.2d 1081, 1084. To determine the presence or absence of a genuine issue of material fact, inferences derived from evidentiary materials must be viewed in a light most favorable to the non-moving party. Wood v. Mercedes–Benz of Okla. City, 2014 OK 68, ¶ 4, 336 P.3d 457, 459.

### *Analysis*

¶ 13 The issue presented on appeal is whether the language in the original Fitzwa-

ter and Impoundment Easements authorize LCCD to enter the Respondents' property to perform rehabilitation work on FWRS 54 without payment of compensation. The original easements were created by deed. According to the terms of the deed creating the Fitzwater Easement, grantee was authorized to construct, operate, maintain, and inspect FWRS 54. Additionally, the conveying instruments provided the grantee with the right of "ingress and egress ... over and upon the [subject property] ... for the purpose of construction, the checking of operations, and the inspection and maintenance of [FWRS 54]." Most important, the deed expressly imposed a duty on the grantee to ensure FWRS 54 was in proper repair and functioning safely, by specifying "[t]he Grantee is *responsible* for operating and maintaining [FWRS 54]." (emphasis added). The instruments creating the Impoundment Easements provided the right to utilize the property for "permanent storage or temporary detention" of water brought about through the construction of FWRS 54. They also afforded the same basic rights and privileges as the Fitzwater Easement.

¶ 14 An easement creates a legal relationship between two parties. The easement holder is referred to as the dominant estate; and the owner of land subject to an easement is known as the servient estate. Bouziden v. Alfalfa Elec. Coop., Inc., 2000 OK 50, ¶ 16, n. 10, 16 P.3d 450, 456. An easement affords its titleholder a limited non-possessory right to use a parcel of land for a specific purpose. Restatement (Third) of Prop., Servitudes § 1.2 (1) (2000); see also Kraettli Q. Epperson, 5A Vernon's Okla. Forms 2d, Real Estate § 4.100 (2d ed. 2015). An easement may be created via deed, by implication, or through prescriptive use. Head v. McCracken, 2004 OK 84, ¶ 11, 102 P.3d 670, 676. The owner of an easement may utilize the servient estate in such a manner that is reasonably necessary to carry out the servitude's intended purposes and to allow enjoyment of the rights bestowed by the easement. Burkhart v. Jacob, 1999 OK 11, ¶ 11, 976 P.2d 1046, 1049; see also Restatement (Third) of Prop., Servitudes §§ 4.10,

---

**8.** Journal Entry of Judgment dated September 19, 2014, Rec. Vol. IV, Doc. 15.

Comment c (2000). Neither party may utilize the property in a manner which interferes with or unduly burdens the rights of the other. Restatement (Third) of Prop, Servitudes §§ 4.9–4.10 (2000).

▮ ¶ 15 When property rights originate by deed, the scope of those rights should be construed in the same manner as other written contracts. Beattie v. State ex rel. Grand River Dam Auth., 2002 OK 3, ¶ 8, 41 P.3d 377, 380. Of paramount concern is the intention of the parties at the time of the original conveyance. Pub. Serv. Co. of Okla. v. Home Builders Ass'n of Realtors, Inc., 1976 OK 120, ¶ 6, 554 P.2d 1181, 1184. If a written instrument creating an easement "is plain and unambiguous, and there is no uncertainty therein, the intent of the parties is to be determined by the language of the written instrument alone." Beattie, ¶ 12, 41 P.3d at 382; Johnson v. Butler, 1952 OK 207, ¶ 6, 206 Okla. 632, 245 P.2d 720, 722. Words " 'must be viewed in the context of the contract and must be given [their] plain ordinary meaning.' " Lucas v. Bishop, 1998 OK 16, ¶ 11, 956 P.2d 871, 874. An agreement is only considered ambiguous if it is susceptible to different interpretations; but courts should refrain from creating an ambiguity by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on [a] provision." Osprey L.L.C. v. Kelly–Moore Paint Co., Inc., 1999 OK 50, ¶ 14, 984 P.2d 194, 199. Only when the contractual document is unclear or inconsistent may courts utilize extrinsic evidence to ascertain intent. Beattie, ¶ 12, 41 P.3d at 382.

¶ 16 In the present case, the deeds creating the Fitzwater and Impoundment Easements authorized use of the subject real property to construct FWRS 54. The deeds also authorized the grantee, its successors and assigns, to enter the property for the purposes of "the checking of operations, and the inspection and maintenance of the structure." But the deeds did much more than permit these actions, they also *obligated* LCCD to operate and maintain FWRS 54 to ensure it was in good repair and serving its intended purpose. The critical terms contained in the easements are not words of limitation; but instead provide broad rights

to allow the grantee and its successors to carry out acts necessary to ensure the integrity of FWRS 54 and the safety of the public.

¶ 17 This Court has previously considered the terms "operation" and "maintenance" for purposes of statutory interpretation and concluded words should be read utilizing ordinary meanings unless contrary to the intent and purpose of the statute. Medina v. State, 1993 OK 121, ¶¶ 6–7, 871 P.2d 1379, 1382; see also Heath v. Guardian Interlock Network, Inc., 2016 OK 18, ¶ 16, 369 P.3d 374 (recognizing "maintenance means the upkeep of property or equipment and maintain means to keep in good condition by making repairs, correcting problems, etc.").

▮ ¶ 18 Respondents argue that 27 O.S.Supp. 2008 § 3–3–411 cannot be applied retroactively to interpret the Fitzwater and Impoundment deeds. At the time the parties executed the Fitzwater and Impoundment Easements, the Conservancy Act of Oklahoma (82 O.S. 1961 § 531, et seq.) was in effect. Under this Act, conservancy districts were established throughout the state to assist with flood prevention, regulating the flow of water systems, and the development of water for domestic, agricultural, and commercial use. 82 O.S. 1961 § 541(b). To carry out this statutory purpose, districts were permitted to build, operate, maintain and repair reservoirs, canals, levees, and dams. 82 O.S. 1961 § 541(b)(7). Districts were further authorized under the federal Watershed Protection and Flood Prevention Act, to work with the USDA "in carrying out, maintaining, and operating the works of improvement authorized by said Act." 82 O.S. 1961 § 541.1. The language of the 1961 Conservancy Act mirrors the language contained in the original deeds. The intended purpose of FWRS 54 and the original easements was the permanent eradication of flooding in the Cottonwood Creek watershed. The parties to the 1962 conveyance intended the servitudes to be perpetual, or at least open-ended; empowering the easement owner to respond to public safety issues presented by aging or damaged levees, dams, and other flood prevention infrastructure. Because the 2008 statutory clarification is consistent with the original purpose of the flood prevention statutes

and projects, it was not error for the trial court to rely on the enactment to determine the proposed rehabilitation of FWRS 54 was within the scope of the original easements.

¶ 19 Considering the unambiguous terms of the deeds, together with the easements' intended purpose of protecting citizens and property in this state, we must find that the subject easements permit necessary rehabilitation to keep FWRS 54 functioning in a safe manner.[9] It would be illogical to sanction the performance of routine annual inspections and maintenance, but prohibit repairs which are necessary to prevent catastrophic failure of the structure. Dams and other water retarding structures have finite lifespans. Despite being a structure with a limited functional duration, the conveying instrument confers a right of enjoyment "for so long as [grantees] should use said easement for the purpose described above." Thus, the parties to the original easements anticipated the need, at some point in the future, to repair, rebuild, rehabilitate or improve FWRS 54 as necessary. Prior decisions from this Court support our conclusion.

¶ 20 For example, in Nazworthy v. Ill. Oil Co., 1986 OK 150, 176 Okla. 37, 54 P.2d 642, a landowner brought suit for an alleged taking following an oil company's relocation of an oil pipeline on the landowner's property. In 1913, Empire Refining Company laid pipeline along a state highway. Id. Eight years later Empire transferred its interest in the pipeline to Illinois Oil Company. Id. In 1927, the State Highway Commission decided to widen and improve the highway. Id. ¶ 3, 54 P.2d at 642. The Commission negotiated and contracted with an adjacent property owner to acquire a perpetual easement needed for the highway construction. Id. To complete the roadwork it became necessary to relocate the pipeline, and the Highway Commission directed Illinois Oil to reposition the pipeline outside of the anticipated roadwork. Id. ¶ 4, 54 P.2d at 642. After completing the pipeline relocation the landowner filed suit for an alleged taking of private property without compensation. Id. A jury trial was held and a

verdict was returned in favor of the Illinois Oil. Id. ¶¶ 6, 8, 54 P.2d at 643. Landowner appealed and this Court concluded the placement of the pipeline was within the highway easement and not an "additional burden or servitude as would entitle the abutting landowner to additional compensation for such use." Id. ¶ 28, 54 P.2d at 646. In reaching this decision, we recited with approval a passage from the case of Cater v. Nw. Tel. Exch. Co., 60 Minn. 539, 63 N.W. 111, 112 (1895):

> If there is any one fact established in the history of society and the law itself, it is that the mode of exercising this easement is expansive, developing and growing as civilization advances. In the most primitive state of society the conception of a highway was merely a footpath; in a slightly more advanced state it included the idea of a way for pack animals; and next a way for vehicles drawn by animals—constituting, respectfully, the *iter*, the *actus*, and the *via* of the Romans. And thus the methods of using public highways expanded with the growth of civilization until today our urban highways are devoted to a variety of uses not known in former times, and never dreamed of by the owners of the soil when the public easement was acquired. ***Hence it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed. And it is not material that these new and improved methods of use were not contemplated by the owner of the land when the easement was acquired, and are more onerous to him than those then in use.***

Id. ¶ 17, 54 P.2d at 643–644 (emphasis added).

¶ 21 A similar case stemming from a landowner's claim of entitlement to compensation for alterations and improvements to a public

---

9. See Rest. (Third) of Prop., Servitudes § 4.1(1) (2000) ("A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created.")

road easement was decided in <u>Bogart v. CapRock Commc'ns Corp.</u>, 2003 OK 38, 69 P.3d 266. In <u>Bogart</u>, an aggrieved landowner had purchased property which was burdened by two easements acquired in connection with the construction a highway. A telecommunications company obtained permission from the Sequoyah County Commissioners to lay fiber optic cables within the easement boundary. <u>Id.</u> ¶ 6, 69 P.3d at 269. The landowner brought suit, alleging *inter alia* that the installation of fiber optic cables burdened the property with an additional servitude and constituted a taking without just compensation. <u>Id.</u> ¶ 11, 69 P.3d at 270. We retained the case and found Oklahoma statutes specifically authorized placement of communication lines within highway or road easements. <u>Id.</u> ¶ 16, 69 P.3d at 272. However, that did not end our inquiry. Although authorized to place the telecommunications cables, we considered whether compensation was warranted based on the company's use of landowner's property. <u>Id.</u> Relying on our prior opinion in <u>Nazworthy</u> we determined "the installation of fiber optic cables within the confines of a public right of way or easement on which public highways or roads are established does not impose any increased servitude on the land which would entitle the landowner to additional compensation under the facts presented." <u>Id.</u> ¶ 20, 69 P.3d at 273; see also <u>Town of Ft. Cobb v. Robinson</u>, 1944 OK 74, ¶¶ 8–9, 193 Okla. 660, 143 P.2d 122, 123 (allowing easement holder to construct a fence to protect water wells as reasonably incident to the primary easement).

¶ 22 Unless, specifically prohibited by a conveying instrument, the owner of an easement is entitled to conduct repairs and improvements necessary to ensure enjoyment. This is true so long as repairs or improvements do not exceed the rights bestowed by the original easement or unduly burden the servient estate. Restatement (Third) of Prop., Servitudes §§ 4.10 (2000). "The manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude." <u>Id.</u> see also H.D.W., *Right of owner of easement of way to make improvements or repairs thereon*, 112 A.L.R. 1303 (1938) ("It is a general rule that the owner of an easement of way may prepare, maintain, improve, or repair the way in a manner and to an extent reasonably calculated to promote the purposes for which it was created or acquired, causing neither an undue burden upon the servient estate, nor an unwarranted interference with the rights of common owners or the independent rights of others.").[10]

¶ 23 An almost identical dispute was resolved by the Kansas Supreme Court in the <u>City of Arkansas City v. Bruton</u>, 284 Kan. 815, 166 P.3d 992 (2007). In <u>Bruton</u>, the Kansas Supreme Court evaluated an easement conveyed to a municipality for the purpose of constructing "a dike along the Arkansas River to protect the City and its inhabitants from flooding." <u>Id.</u> at 995. The easement authorized the City of Arkansas City to "construct and maintain" a dike on the subject property.[11] <u>Id.</u> Throughout the first 65 years, the City carried out ordinary maintenance and upkeep on the dike, but did not perform any major upgrades or repairs. <u>Id.</u> at 996. In April of 2000, the City began efforts to implement significant improvements to the dike. <u>Id.</u> Property owners objected to reconstructing the dike, arguing the planned modifications exceeded the

**10.** Decisions around the United States consistently recognize the inherent right of an easement holder to maintain, repair, or improve the property interest in furtherance of its intended purposes. see e.g., <u>Woods v. Shannon</u>, 378 Mont. 365, 344 P.3d 413, 417 (2015); <u>Koch v. J & J Ranch, L.L.C.</u>, 299 P.3d 689, 694, 696 (Wyo. 2013); <u>Parris Properties, L.L.C. v. Nichols</u>, 305 Ga.App. 734, 700 S.E.2d 848, 853–854 (App. 2010); <u>Koenigs v. Mitchell Cty. Bd. of Supervisors</u>, 659 N.W.2d 589, 594 (Iowa 2003); <u>State Soil & Water Conservation Comm'n v. Stricklett</u>, 252 Ga.App. 430, 555 S.E.2d 800, 804 (2001);

<u>Shallow Run Ltd. P'ship v. State Highway Admin.</u>, 113 Md.App. 156, 686 A.2d 1113, 1121 (1996); <u>C/R TV, Inc. v. Shannondale, Inc.</u>, 27 F.3d 104, 108 (4th Cir.1994); <u>Swango Homes, Inc. v. Columbia Gas Transmission Corp.</u>, 806 F.Supp. 180, 185 (S.D. Ohio 1992); <u>Hayes v. City of Loveland</u>, 651 P.2d 466, 468 (Colo.App.1984).

**11.** Unlike the Fitzwater and Impoundment Easements, the easement in <u>Bruton</u> included technical plans and specifications for building the floodwater retarding structure.

scope of the original easement and amounted to a taking of private property. Id. On review, the Kansas Supreme Court disagreed, holding the terms "maintain" and "maintenance" included the right of the City to reconstruct the dike. Id. at 1011.[12] To reach this decision, the Court relied on a simple definition of the word "maintain" and the inherent right of an easement holder to construct, improve or repair his or her easement under the Restatement. Id. We find the simple straightforward analysis in Bruton to be compelling.

¶ 24 Progress and technological advancements are a certainty in this world. It would be unreasonable to conclude an easement which authorizes the construction of a flood prevention structure, designed to ensure the safety and well-being of Oklahoma's citizens, also prohibited future repairs or improvements. According to the 2006 Supplemental Watershed Plan, if FWRS 54 were to suffer a catastrophic failure, it would endanger the lives of multiple households downstream.[13] Unless specifically proscribed by the conveyance, the dominant estate owner has an inherent right to make reasonably necessary improvements and repairs, so long as they are performed within the confines of the easement boundary and are designed to carry out the original intended purpose of the easement grant. See Weeks v. Wolf Creek Indus., Inc., 941 So.2d 263, 269 (Ala. 2006) (noting "the law favor[s] changes and improvements for the benefit of the dominant estate so long as the manifest intent of the parties does not disallow the changes and the burden to the servient tenement is not increased.").

¶ 25 In POLA's motion for partial summary judgment, the association asserted that draining the lake to reconstruct FWRS 54 and permanently lowering the lake's water level would amount to a taking of private property for which compensation must be paid. POLA provided no authority in support of this conclusory argument. Generally, propositions which are unsupported with authority are deemed waived. Hough v. Hough, 2004 OK 45, ¶ 16, 92 P.3d 695, 703. Nevertheless, none of the deeds creating the respective easements mandated a particular water level. Indeed, the express language of the Fitzwater and Impoundment Easements authorized water retention to be either temporary or permanent in nature. The conveying instrument stated its purpose was "[f]or the permanent and temporary detention, either or both." Naturally, the water level will fluctuate during periods of drought or high rainfall. Homeowners do not dispute that the retained water was never intended to create a private body of water.

¶ 26 On this issue we agree with the rationale adopted by the Nebraska Supreme Court in Kiwanis Club Found., Inc., of Lincoln v. Yost, 179 Neb. 598, 139 N.W.2d 359 (1966), and find its guiding principles should be applied to the present case. Therein, the Yost Court held that an owner of a dam had no obligation to maintain the dam's existence to benefit upper riparian property owners.[14]

12. See also, Hous. Pipe Line Co. v. Dwyer, 374 S.W.2d 662, 664 (Tex.1967) (holding "the terms 'operate' and 'maintain' in the granting clause [of an easement] are at least broad enough to include the right to remove and replace the original pipe with pipe of the same size when necessary."); United States v. Green Acres Enters, Inc., 86 F.3d 130, 134 (8th Cir.1996) (finding "the unambiguous language [of an easement] makes clear that the right to maintain the levees includes the right to repair breaches in the levees caused by floods."); Talty v. Commonwealth Edison Co., 38 Ill.App.3d 273, 347 N.E.2d 74, 76 (1976) (recognizing that although easements did not contain words reconstruct or renew, terms construct, operate, use and maintain authorized replacing electrical lines to modernize system).

13. Interestingly, the 2006 plan contains the following excerpt: "Seismic: The Cottonwood Creek Watershed is located in an area of very low potential seismic activity. Therefore, seismic activity presents a low potential mode of failure for [FWRS 54]." Appendix to Petitioner's Motion for Summary Judgment, Rec. Vol. I, Doc. 2, Exhibit G.

14. The Yost Court believed that property owners who build or improve land adjacent to an artificial lake are clearly on notice of the risks inherent with such development:

Construction and maintenance of a dam over a long period of years may well tend to lead persons owning property above the dam to believe that a permanent and valuable right has been acquired, or is naturally present. The very fact that a manmade dam is obviously present, however, is sufficient to charge them with notice that the water level above the dam

Id. at 361. Unless an agreement provides otherwise, a dam owner would be free to "return a river to its natural state by removing or destroying the dam." Id. In other words, "construction and maintenance of such a dam does not create any reciprocal rights in upstream riparian proprietors based on prescription, dedication, or estoppel." Id. Accordingly, we find the Respondents have neither a right to demand water levels be maintained at a particular depth, nor a right to compel the continued existence of any water retarding structure.

### Conclusion

¶ 27 We hold that the unambiguous terms of the instruments creating the Fitzwater and Impoundment Easements authorize LCCD to enter the subject property to perform rehabilitation work on FWRS 54. The need to perform rehabilitation FWRS 54 is undisputed and necessary to continue serving its intended purpose. The property owner's purchased their respective properties subject to burdens associated with the Fitzwater and Impoundment Easements. Further, the trial court correctly determined LCCD is not required to maintain any particular level of retained water. As such, the trial court correctly awarded summary judgment in favor of LCCD.

**TRIAL COURT'S JOURNAL ENTRY OF JUDGMENT IS AFFIRMED**

¶ 28 ALL JUSTICES CONCUR

is artificial as distinguished from natural, and that its level may be lowered or returned to the natural state at any time.